IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SURAJADIN ABIB | ) | |
| | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1000 (PLF) |
| | ) | |
| GEORGE W. BUSH, *et al.,* | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

## DECLARATION OF TERESA A. McPALMER

     Pursuant to 28 U.S.C. § 1746, I, Commander Teresa A. McPalmer, Judge Advocate General's Corps, United States Navy, hereby state that to the best of my knowledge, information, and belief, the following is true, accurate and correct:

     1.    I am the Legal Advisor to the Office for the Administrative Review of the Detention of Enemy Combatants at U.S. Naval Base Guantanamo Bay, Cuba (OARDEC). In that capacity I am an advisor to the Director, Combatant Status Review Tribunals.

     2.    I hereby certify that the documents attached hereto constitute a true and accurate copy of the portions of the record of proceedings before the Combatant Status Review Tribunal related to petitioner Surajadin Abib that are suitable for public release. The portions of the record that are classified or considered law enforcement sensitive are not attached hereto or were redacted by an OARDEC staff member. This staff member also redacted information that would personally identify certain U.S. Government personnel in order to protect the personal privacy and security of those individuals.

     I declare under penalty of perjury that the foregoing is true and correct.

Dated: _24 April 2006_

                             _Teresa A. McPalmer_
                             Teresa A. McPalmer
                             CDR, JAGC, U. S. Navy



# Department of Defense
## Director, Combatant Status Review Tribunals

OARDEC/Ser: ~~1040~~ SECT.

1041

15 MAR 2005

~~FOR OFFICIAL USE ONLY~~

From:  Director, Combatant Status Review Tribunal

Subj:  **REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR
DETAINEE ISN # 458**

Ref:  (a) Deputy Secretary of Defense Order of 7 July 2004
(b) Secretary of the Navy Order of 29 July 2004

1. I concur in the decision of the Combatant Status Review Tribunal that Detainee ISN #458 meets the criteria for designation as an Enemy Combatant, in accordance with references (a) and (b).

2. This case is now considered final and the detainee will be scheduled for an Administrative Review Board.

J. M. McGARRAH
RADM, CEC, USN

Distribution:
NSC (Mr. John B. Wiegmann)
DoS (Ambassador Prosper)
DASD-DA
JCS (J5)
SOUTHCOM (CoS)
COMJTFGTMO
OARDEC (Fwd)
CITF Ft Belvoir

~~FOR OFFICIAL USE ONLY~~

8 Mar 05

FIRST ENDORSEMENT on CDR B. A. Ermentrout ltr of 2 Feb 05

From:  Legal Advisor
To:    Director, Combatant Status Review Tribunal

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
       FOR DETAINEE ISN # 458

1. Forwarded, recommending the finding of the Tribunal be approved.

2. The Tribunal President denied witnesses requested by the detainee to rebut the allegation that he provided support to Jalaluddin Haqqani, a high-ranking Taliban official.[1] The President explained that she denied the requests because these witnesses did not have first-hand knowledge of events and were not disinterested witnesses. These were patently illegitimate reasons for finding the witnesses to be "not relevant." First, as noted by the Assistant Legal Advisor, whether or not a witness is biased goes to the weight a fact-finder assigns to their testimony. It does not affect the relevance of their testimony. Second, there is no requirement in the CSRT establishment or implementation directives that witnesses possess first-hand knowledge. Reference (b) states that, "[t]he Tribunal is not bound by the rules of evidence such as would apply in a court of law. Instead, the Tribunal shall be free to consider any information it deems relevant and helpful to a resolution of the issues before it." *See* paragraph G(7) of enclosure (1) of reference (b). The Directive states that the Tribunal has discretion to consider hearsay evidence, but I believe it would be an abuse of discretion for the Tribunal to consider *all* Government hearsay and at the same time deny *all* hearsay tendered by the detainee. Although it was improper for the Tribunal President to make her decision based on these reasons, there is no reason for us to turn a blind eye to reality when reviewing the Tribunal's decision. The simple fact is that, based on our experience with dozens of witness requests forwarded to the Government of Afghanistan, it is extraordinarily unlikely that a request for Afghan witnesses would have been responded to at all, let alone positively. It was an error, but an error without an effective solution.

3. The evidence to support the detainee's classification as an enemy combatant was relatively small. Nonetheless, it is not the role of the legal advisor to second-guess the tribunal's decision. In analyzing whether there was sufficient evidence to support a tribunal's status decision I have customarily used the test of whether there was sufficient evidence for a reasonable finder of fact to have found that the detainee was an enemy combatant by a preponderance of the evidence. In this case, there was evidence by which reasonable tribunal members could have found that the detainee's direct support to Jalaluddin Haqqani, went beyond simply providing shelter and was sufficient to characterize the detainee as an enemy combatant. Therefore, given the low evidentiary hurdle posed by a preponderance of the evidence standard,[2] I believe that the test is

---

[1] Due to the Tribunal's poor documentation, it is unclear exactly who these requested witnesses were.
[2] The preponderance of the evidence standard may be simply stated as "more likely than not."

minimally satisfied in this case. That is to say that reasonable finders of fact could determine that this detainee meets the definition of "enemy combatant" based on the evidence presented.

4. I recommend that the finding of the Tribunal be approved.

JAMES R. CRISFIELD JR.
CDR, JAGC, USN

2 Feb 05

MEMORANDUM

From:  Assistant Legal Advisor
To:    Director, Combatant Status Review Tribunal
Via:   Legal Advisor

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
       FOR DETAINEE ISN # 458

Ref:   (a) Deputy Secretary of Defense Order of 7 July 2004
       (b) Secretary of the Navy Implementation Directive of 29 July 2004

Encl:  (1) Appointing Order for Tribunal # 24 of 26 November 2004
       (2) Appointing Order for Tribunal # 27 of 9 December 2004
       (3) Record of Tribunal Proceedings

1.  Legal sufficiency review has been completed on the subject Combatant Status Review
Tribunal in accordance with references (a) and (b).  After reviewing the record of the Tribunal,[1] I
find that:

    a.  The detainee was properly notified of and actively participated in the Tribunal process.
The detainee provided a sworn oral statement at the Tribunal hearing.

    b.  The Tribunals were properly convened and constituted by enclosures (1) and (2).

        1.  Tribunal # 24 conducted two hearings.  The detainee made sworn oral
statements at both hearings.  Exhibits R-1 through R-19 were available at the first
hearing.  The second hearing was held to review additional information.[2]  The
Tribunal recessed before deliberations were completed.

        2.  Tribunal # 27 was convened to review yet more information.[3]  At the time this
additional information was received, two members of Tribunal # 24 were no
longer available.  Therefore, the case was assigned to a new tribunal.

    c.  The Tribunal substantially complied with all provisions of references (a) and (b).
Note that some information in exhibits R-4 through R-6, R-24, and R-25 was redacted.
The FBI properly certified in exhibits R-2 and R-20 that the redacted information would

---

[1] Tribunal # 27 issued the final determination in this case.  For purposes of the legal review, since Tribunal # 27
reviewed the documents provided to Tribunal # 24, only the decision of Tribunal # 27 is relevant.  However, for
clarity the proceedings of both Tribunals will be discussed.
[2] Page 2 of enclosure (1) to the Tribunal Decision Report incorrectly states that the additional information was
received in response to the detainee's request.
[3] It is unclear from the record of proceedings what information was received by Tribunal # 24 at the second hearing
and what additional information Tribunal # 27 reviewed.

Subj: LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
FOR DETAINEE ISN # 458

not support a determination that the detainee is not an enemy combatant. Note that some information contained in exhibit R-25 has been redacted. It is clear that the redacted information consists of portions of Internment Serial Numbers (ISNs) and classification marks and that the redacted information would not support a determination that the detainee is not an enemy combatant.

d. The detainee initially requested one witness, his brother. This witness was determined to be relevant and reasonably available and did testify on behalf of the detainee.

During the first rehearing, the detainee stated that if an additional charge of harboring Haqqani (a Taliban commander) was going to be added to the allegations against him, he was going to request additional witnesses to testify that Haqqani was not present at the time his house was bombed. He refused to name these witnesses, but said that he would name these witnesses if the Tribunal added a new allegation. The detainee also asked to introduce a letter from his village elder. He proffered that the letter would show that his house was bombed by accident (and not because he was harboring Haqqani).

The initial Tribunal President presumed the accuracy of the village letter, thereby eliminating the need to produce the letter. He also determined that the Tribunal did not have the authority to add allegations. The Tribunal recessed before deliberations were completed. (*See* enclosure (1) to the Tribunal Decision Report.)

Tribunal # 27 met to evaluate additional evidence. As part of its evaluation, it received all evidence presented to Tribunal # 24. It determined that the detainee's link to Haqqani was the only factor that might lead to continued detention of the detainee. The Tribunal President determined that this link was a de facto allegation, and therefore considered the detainee's request for additional witnesses. (*See* enclosure (1) to the Tribunal Decision Report.)

The Tribunal President determined that these witnesses were not relevant. First, he noted that the only witnesses who were present at the house were family members and therefore not disinterested. Second, he noted that any witness not present at the house could not have had first-hand knowledge of Haqqani's presence or absence. In my opinion, this was an abuse of the Tribunal President's discretion. The witnesses were clearly relevant. The fact that requested witnesses are not disinterested is irrelevant to the issue of relevancy and goes only to the weight to attach to the testimony. Second, witnesses not present at the house could be first-hand witnesses to Haqqani's *absence*.

The detainee did not request that any additional witnesses or evidence be produced.

e. The Tribunal's decision that detainee # 458 is properly classified as an enemy combatant was unanimous. Regrettably, the Tribunal relied on an article in *The New York Times* as well as other journalistic, rather than intelligence, sources. Nevertheless, in my opinion, sufficient information exists to classify the detainee as an enemy

UNCLASSIFIED

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
FOR DETAINEE ISN # 458

combatant.  The Tribunal members had to sift through conflicting documents.  But despite conflicting information, sufficient evidence exists to classify the detainee as an enemy combatant.  And the Tribunal members were in a better position to judge the credibility of the detainee and the witness.

f.  The detainee's Personal Representative was given the opportunity to review the record of proceedings and declined to submit post-tribunal comments to the Tribunal.

2.  The proceedings and decision of the Tribunal as reflected in enclosure (3) are legally sufficient and no corrective action is required.

3.  I recommend that the decision of the Tribunal be approved and the case be considered final.

BREE A. ERMENTROUT
CDR, JAGC, USNR

3



# Department of Defense
### Director, Combatant Status Review Tribunals

26 Nov 04

From: Director, Combatant Status Review Tribunals

Subj: APPOINTMENT OF COMBATANT STATUS REVIEW TRIBUNAL #24

Ref: (a) Convening Authority Appointment Letter of 9 July 2004

By the authority given to me in reference (a), a Combatant Status Review Tribunal established by "Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba" dated 29 July 2004 is hereby convened. It shall hear such cases as shall be brought before it without further action of referral or otherwise.

The following commissioned officers shall serve as members of the Tribunal:

       **MEMBERS:**

              █████████████████, Colonel, U.S. Air Force; President

              █████████████████, Lieutenant Colonel, U.S. Air Force; Member (JAG)

              ████████████, Lieutenant Commander, U.S. Navy; Member

J. M. McGARRAH
Rear Admiral
Civil Engineer Corps
United States Navy



# Department of Defense
## Director, Combatant Status Review Tribunals

9 Dec 04

From:  Director, Combatant Status Review Tribunals

Subj:  APPOINTMENT OF COMBATANT STATUS REVIEW TRIBUNAL #27

Ref:   (a) Convening Authority Appointment Letter of 9 July 2004

By the authority given to me in reference (a), a Combatant Status Review Tribunal established by "Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba" dated 29 July 2004 is hereby convened. It shall hear such cases as shall be brought before it without further action of referral or otherwise.

The following commissioned officers shall serve as members of the Tribunal:

**MEMBERS:**

█████████████ Colonel, U.S. Army; President

█████████████ Lieutenant Colonel, U.S. Air Force; Member

█████████████████ Lieutenant Colonel, U.S. Air Force; Member (JAG)

J. M. McGARRAH
Rear Admiral
Civil Engineer Corps
United States Navy



**HEADQUARTERS, OARDEC FORWARD**
GUANTANAMO BAY, CUBA
APO AE 09360

28 January 2005

MEMORANDUM FOR DIRECTOR, CSRT

FROM:  OARDEC FORWARD Commander ICO ISN 458

1. Pursuant to Enclosure (1), paragraph (I)(5) of the *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba* dated 29 July 2004, I am forwarding the Combatant Status Review Tribunal Decision Report for the above mentioned ISN for review and action.

2. If there are any questions regarding this package, point of contact on this matter is the undersigned at DSN ▮▮▮▮▮.

CHARLES E. JAMISON
CAPT, USN

~~SECRET//NOFORN//X1~~

### (U) <u>Combatant Status Review Tribunal Decision Report Cover Sheet</u>

(U) This Document is UNCLASSIFIED Upon Removal of Enclosures (2) and (4).

(U) TRIBUNAL PANEL: ___#27___

(U) ISN#: ___458___

Ref:    (a) (U) Convening Order for Tribunal #24 of 26 November 2004 (U)
          (b) (U) Convening Order for Tribunal #27 of 9 December 2004 (U)
          (c) (U) CSRT Implementation Directive of 29 July 2004 (U)
          (d) (U) DEPSECDEF Memo of 7 July 2004 (U)

Encl:    (1) (U) Unclassified Summary of Basis for Tribunal Decision (U/~~FOUO~~)
          (2) (U) Classified Summary of Basis for Tribunal Decision (S/NF)
          (3) (U) Summary of Detainee/Witness Testimony (U/~~FOUO~~)
          (4) (U) Copies of Documentary Evidence Presented (S/NF)
          (5) (U) Personal Representative's Record Review (U/~~FOUO~~)

1. (U) This Tribunal was convened by references (b) and (c) to make a determination as to whether the detainee meets the criteria to be designated as an enemy combatant as defined in reference (c). Tribunal #24 was previously convened by reference (a) to make the same determination, however, the previous Tribunal recessed to allow the Recorder to obtain additional evidence.

2. (U) On 3 December 2004 and 14 December 2004, Tribunal #24 recessed without making findings. Two board members from Tribunal #24 are no longer available. On 20 January 2005, Tribunal #27 determined, by a preponderance of the evidence, that Detainee #458 is properly designated as an enemy combatant, as defined in reference (d).

3. (U) In particular, the Tribunal finds that this detainee assisted a member of the Taliban, as more fully discussed in the enclosures.

4. (U) Enclosure (1) provides an unclassified account of the basis for the Tribunal's decision. A detailed account of the evidence considered by the Tribunal and its findings of fact are contained in enclosures (1) and (2).

COL, U.S. Army
Tribunal President

UNCLASSIFIED//~~FOUO~~

# UNCLASSIFIED SUMMARY OF BASIS FOR TRIBUNAL DECISION

### (Enclosure (1) to Combatant Status Review Tribunal Decision Report)

TRIBUNAL PANEL: _____#27_____

ISN #: _____458_____

## 1. Introduction

As the Combatant Status Review Tribunal (CSRT) Decision Report indicates, the Tribunal has determined that this Detainee is properly classified as an enemy combatant because he was affiliated with the Taliban. In reaching its conclusions, the Tribunal considered both classified and unclassified information. The following is an account of the unclassified evidence considered by the Tribunal and other pertinent information. Classified evidence considered by the Tribunal is discussed in Enclosure (2) to the CSRT Decision Report.

## 2. Synopsis of Proceedings

The unclassified summary of the evidence presented to the Tribunal by the Recorder indicates the Detainee is associated with forces that have engaged in hostilities against the Unites States and its coalition partners. In September or October of 2001, the detainee allegedly worked as a recruiter for Pacha Khan, a renegade Pashtun Commander who has been conducting active field operations against the Afghan Transitional Administration (ATA). The Detainee was captured near Khowst, Afghanistan by U.S. forces on 20 January 2002 with a modified ICOM VHF transceiver. The recorder provided a news article from the New York Times which reported that the detainee's house had been bombed. The Detainee chose to participate in the Tribunal process. The detainee testified that he did work for Pacha Khan, at the behest of his village elders, however, he noted that Pacha Khan worked for United States forces. He did receive 30,000 rupees, but that amount was to assist with repairs to his house. His house was bombed shortly after the Taliban folded. He never saw any Americans and said there was no fighting in their area. He was arrested about a month after his house was bombed. No one fired a shot at the time he was arrested and he did not have a radio when he was arrested. The Detainee called one witness, his brother, who was arrested at the same time. The brother's testimony was consistent. He noted that he lived in his brother's house but was away when the house was bombed. The Detainee's son was also arrested at the same time. A fourth person, a Saudi neighbor, was arrested on the same day.

UNCLASSIFIED//~~FOUO~~

### 3. Evidence Considered by the Tribunal

The Tribunal considered the following evidence in reaching its conclusions:

     a. Exhibits: D-a and D-b, and R-1 through R-39.

     b. Testimony of the following persons: None.

     c. Sworn statement of the detainee.

     d. Sworn statement of the witness.

### 4. Rulings by the Tribunal on Detainee Requests for Evidence or Witnesses

The Detainee initially requested one witness. The president of Tribunal #24 (hereinafter referred to as the initial Tribunal president) ruled that the witness was relevant and the witness testified in the proceeding.

The Detainee later requested additional evidence. During the first rehearing, the Detainee was invited back and given the opportunity to address additional documents. He stated that if the government were going to add an allegation about harboring Haqqani, he wanted to provide additional evidence. Specifically, he wanted to introduce a letter from his village elders that stated his house was mistakenly bombed. He also wanted to request additional witnesses to testify that Haqqani was not present at the time his house was bombed. He refused to name these witnesses, but said that he would tell his Personal Representative if the Tribunal decides to add a new allegation related to Haqqani. During deliberations the initial Tribunal president presumed the accuracy of the Village letter. Given that presumption, there was no need to see the letter. The initial President also ruled that the Tribunal does not have the authority to add allegations. The Tribunal merely hears the evidence before it. The case recessed before deliberations were completed.

Tribunal #27 met to evaluate additional evidence. It became clear that the link to Haqqani was the only factor that might lead to continued detention of the Detainee. Although the Haqqani link is not a named allegation on R-1, it is in essence, a de facto allegation. Thus, the Tribunal President considered the Detainee's request for additional witnesses to testify that Haqqani was not present at his house when it was bombed. The Tribunal President ruled that these witnesses were not relevant. Any witness who was present at the house would have been related to the Detainee. Thus, any such witness would not have been a disinterested witness. The Detainee had already testified that Haqqani was not present and the members would consider that testimony when evaluating the evidence. Any witness who was not present at the house could not be a first-hand witness to Haqqani's presence or absence.

UNCLASSIFIED//~~FOUO~~

### 5. Discussion of Unclassified Evidence

The Tribunal considered the following unclassified evidence in making its determinations:

a. The recorder offered Exhibits R-1 through R-3 into evidence during the initial unclassified portion of the proceeding on 3 December 2004. Exhibit R-1 is the Unclassified Summary of Evidence. While this summary is usually helpful in that it provides a broad outline of what the Tribunal can expect to see, it is not persuasive in that it provides conclusory statements without supporting unclassified evidence. Furthermore, the allegations in R-1 are refuted by unclassified Exhibit R-3. Exhibit R-2 provided no usable evidence. Exhibit R-3 provided no support for the statements asserted in R-1. R-3 is a New York Times newspaper article. The article appears to refute R-1 as it mentions that Pasha Khan was working for the Americans as his troops were providing security for the airport. The New York Times article, dated 2 Feb 02, does provide a separate possible reason for finding that the Detainee was an enemy combatant. The article notes that 20 of 22 people in detainees house were killed by the bomb. At the time of the bombing a Taliban leader, Jalaluddin Haqqani, was at the detainee's house. The bomb killed the Detainee's wife and nine grandchildren and also killed ten of Haqqani's bodyguards. The only two survivors were Haqqani (who was injured) and the detainee. The Times used the Detainee's relatives as sources. They apparently obtained their knowledge from the Detainee. The relatives asserted that the detainee did not know Haqqani but permitted him to stay as a guest based on Pashtu custom. The article also notes that the Americans may have been misled because of a regional power struggle between Wazir Khan Zadran (Pasha Khan's younger brother) and Sakim Khan. The article notes that Americans were not involved in the arrest and does not mention any radio or shooting. The article notes that the men were seized out of their sleep. On 14 December 2004, Exhibits R-20, R-21, and R-22 were offered into evidence. Exhibit R-20 provided no usable evidence. Exhibits R-21 and R-22 are additional open source documents that show the Detainee's residence was bombed and that Haqqani was apparently present.

b. The Tribunal considered Detainee's sworn testimony. The Detainee testified on 3 December 2004 and on 14 December 2004. The summarized transcripts of the Detainee's sworn testimony is attached as CSRT Decision Report Enclosure (3). Prior to the Detainee's testimony on 3 December 2004, the initial Tribunal president noted that the Detainee had apparently been told that if he testified under oath, he would be set free. The president clarified that any such promise did not apply here. The Detainee admitted he worked for Pacha Khan but insisted that Pacha Khan was a member of the coalition forces. The village elders had asked him to go to several villages to find recruits to fight the Taliban. If Pacha Khan turned on the United States, that was not his problem. He also testified about the bombing of his house. He did not know why his house was bombed, but received 30,000 rupees to help pay for repairs. He denied that he never had a VHF transceiver, denies that he was arrested with a VHF transceiver, and further states that he would not know how to use electronic equipment. He never saw any Americans

**UNCLASSIFIED//~~FOUO~~**

and said there was no fighting in their area. He was arrested about a month after his house was bombed. No one fired a shot at the time he was arrested and he did not have a radio when he was arrested. He did not know if a Saudi neighbor had a radio when that neighbor was arrested the same day. On 14 December 2004, the Detainee again testified and addressed the reported presence of Haqqani. He denied that Haqqani was at his residence. He noted that one of the sources named in one of the articles was his cousin Sadem (the Tribunal did not receive this document) who was not at his compound that day. He noted that the Council of Khost had provided a letter to the U.S. that stated that his house was bombed by accident. He was shown the letter by an interrogator and wanted it introduced into evidence. The Detainee asked whether harboring Haqqani was a new allegation and stated he wanted additional witnesses if that was the case. The initial President informed the Detainee that he was not changing the allegations.

c. The Tribunal considered the testimony of one witness, Khan Zaman. He is the Detainee's brother. The witness's testimony was consistent. The witness was arrested at the same time as the detainee. He stated that Pasha Khan was working for the Americans at the time of the arrest. Pasha Khan became the governor after the Taliban fell. He denied knowledge of any radio and said he had no training in electronics, nor did his brother have such training. He also stated that they had no weapons. He testified that a village elder, Nazim, brought the 30k rupees but did not know where Nazim got the money. He noted that he lived in his brother's house, but was away at Gardez (ph.) when the house was bombed. Per the witness, there were no shots fired when they were arrested. Detainee's son was also arrested at the same time. A fourth person, a Saudi neighbor, was arrested on the same day. He was a villager that lived next door. He did not know if that person was captured with anything.

The Tribunal also relied on certain classified evidence in reaching its decision. A discussion of the classified evidence is found in Enclosure (2) to the Combatant Status Review Tribunal Decision Report.

## 6. Consultations with the CSRT Legal Advisor

No issues arose during the course of this hearing that required consultation with the CSRT legal advisor.

## 7. Conclusions of the Tribunal

Upon careful review of all the evidence presented in this matter, the Tribunal makes the following determinations:

a. The Detainee was mentally and physically capable of participating in the proceeding. No medical or mental health evaluation was deemed necessary.

b. The Detainee understood the Tribunal proceedings. He asked no questions regarding his rights and actively participated in the hearing.

**UNCLASSIFIED//~~FOUO~~**

UNCLASSIFIED//~~FOUO~~

    c. The Detainee is properly classified as an enemy combatant and supported the Taliban.

## 8. Dissenting Tribunal Member's report

None. The Tribunal reached a unanimous decision.

Respectfully submitted,

COL, U.S. Army
Tribunal President

## Summarized Detainee Sworn Statement

Tribunal President: This hearing shall come to order and for the record, this is a reconvening of a previous hearing for Sarajuddin. For the record the Tribunal panel is the same as previously convened however, there has been some changes in other Tribunal staff. At this time I would like the Recorder to be sworn in.

*Tribunal President administered oath to the Recorder.*

Tribunal President: The Reporter has also been changed for this Tribunal. The Reporter will now be sworn.

*Recorder administered oath to the Reporter.*

Tribunal President: For the record, the Translator will now be sworn.

*Recorder administered oath to the Translator.*

*Hearing recessed to bring in detainee. The Tribunal President reopened the Hearing.*

Tribunal President: Sarajuddin we have reconvened this hearing because of additional information that we have received. Some of this information is unclassified and it is provided to this Tribunal in your presence. The three Tribunal panel members have been previously sworn and this is the same panel you met before. Also the Personal Representative is the same as you had before and he also has been sworn. Also previously the Recorder, Tribunal Reporter and the Translator who are new to this hearing have also been sworn. I will also remind you that the following applies during this hearing as it did at the previous hearing. You may be present at all open sessions of the Tribunal and that is why you were brought back today because this is another open session of the Tribunal. A reminder that if you become disorderly you will be removed from the hearing and the Tribunal will continue to hear evidence in your absence. You are also reminded that you do not have to testify at this Tribunal, but you may testify if you wish to do so. In your previous appearance at this Tribunal you provided a Muslim Oath and I remind you that any testimony would be considered to be under oath to tell the truth. You have the assistance of your Personal Representative as we conduct today's proceedings. Sarajuddin do you understand this process and why your here today.

Detainee: Yes I understand but I do have one concern, one question. Can I say it?

Tribunal President: Yes please.

Detainee: The allegation that I had before, I did answer it and I brought a witness too. If the Tribunal has some new additional information I can answer and I do have a witness for those also. If they just have some clarification on questions then I will answer it and ask the Tribunal to make a decision. That's why I'm here today.

UNCLASSIFIED//~~FOUO~~

Tribunal President: Okay. There are no new allegations or no new unclassified summary information. In our previous questions to your previous witness, your brother, one of the questions was why was your home bombed? Your witness, your brother, said that he did not know, that the United States should know. Part of the reason that you're here today is that the panel did want to know more about why your home was bombed. Related to that, was also another piece of evidence provided to this hearing at the previous assembly. Unclassified evidence identified by R-3 is a New York Times article. This article was provided to you previously for our first hearing. It also addresses the same issue related to the same question that we posed to your brother regarding why your home was bombed. At this time I believe I would like to ask the Recorder if he has any unclassified evidence to present to this Tribunal.

Recorder: Yes sir.

Detainee: If he has some allegation then I can provide a witness for that because I would like to provide a witness for the Tribunal. If they have any I would like to reconvene the Tribunal.

Tribunal President: I understand that you may have a witness for us regarding the information provided but again, a reminder, we have no new allegations regarding your status as an enemy combatant.

Detainee: Okay. Just make sure it's not a new allegation.

Tribunal President: I understand.

*The Recorder presented Exhibit R-20 thru R-22 into evidence.*

Tribunal President: For the record, the panel is reviewing the unclassified evidence provided.

Detainee: Okay.

*The Recorder confirmed that he had no further unclassified evidence or witnesses and requested a closed Tribunal session to present classified evidence.*

**Tribunal Member's questions**

Q. I'm assuming you have seen this document. First of all, I do want to say every time I ask you a question about this, I want to state that I have the greatest sympathy. This is tough for me to ask questions. I guess I want to start off with some clarification by telling you the New York Times article basically implies that you were harboring Haqqani. When I look at this other document it says "U.S. bombs hit walled compound, four buildings of Abdul Gul killing his mother, six brothers and sisters." I wanted to see if I could get you to describe your house. Do you own all of the homes in your compound? Are they all your homes?

A. There was an allegation about Haqqani that he was present in my house and that is why the United States struck. I swore before, I told them that he wasn't there. I did not know this person. I gave a witness. They can testify that that person wasn't in my house at that

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//FOUO

time. Other than that, if you're asking the person who mentioned Haji Abdul it is his neighbor, his villager and he can answer more of your questions if you want to ask him.

Q. This article says you have a wall around your house. Is that common?
A. In our country they do have walls around the house. Under there they make rooms. Sometimes in the middle of the house. Sometimes they make a wall. That's for security for the house. The United States bombed two places. The bombing happened in the Zana Khil (ph) village, and it was my house. The person mentioned in the newspaper, the villager, he said his own house in the village and my own house in the village and they bombed my house. So if that is an allegation on me that Haqqani was there at my house then I will get a witness to present to the Tribunal which can testify that he was not there and I did not know him.

Q. How many people were in your house or on your property the night the bomb hit?
A. There was close to forty people in that house, including children, females and males.

Q. Everybody was a member of your family?
A. Yes.

Q. No guests were staying there that usually don't stay there?
A. No I didn't have guests. The guest that they referred to was that person Haqqani. I do have a witness to say that he wasn't there. If you have more allegations I would like to have a witness. I am innocent and poor and what happened to me wasn't fair. I just swore before in my interrogation and I can do it for the Tribunal as well. If you have more allegations I will go and get another witness for that and for the future also.

Q. Is it your brother you would bring back to say that nobody was there? Who is the witness in the camp that you're talking about? We would like the name today if possible.
A. When I see the allegation then I can see who would actually be a good witness for it, then I can give a name to my PR. If the Tribunal decides that it is acceptable then they can bring those people here.

Tribunal Member: There are no allegations.

Q. How many other buildings do you own? How many of the buildings?
A. That's the only house.

Q. Do you have a guesthouse?
A. No.

Q. Do you have a barn?
A. No.

Q. Haqqani was pretty famous during the war against the Russians. Do you know where he is from?

UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

A. You asked me before and I told you and I can take the oath again but I do not know this person, I never met him and I don't have any information about him. Why don't they ask people who do know him. It must by mistake; somebody told him that they ask me about this person all the time. I told you a couple time that I don't have any information on this person.

Q. You know he's not in your village, correct?
A. It is not fair. If it were true then it happened to me because of that one person which I had never known, they had information about him. They ask me about this person all the time, if I knew him and if he was there at the time, I brought a witness before, Abjah Khan, and he testified and gave witness that I really did not know him and I had no relation with him. It is not fair that because of him I lost twelve people, my family. I have been here for three years in jail and how long should I suffer just because somebody said I have information. If the government has information that I know this person or this person knows me then you can show it to me and I will answer it. If you have any evidence to show today then you can prove it to me and then you can kill me and I won't mind it. Twelve people of my family died and I have been here for three years in prison, what else does your government need from me, just because of a wrong accusation or wrong information? Any evidence that you wish to show to me, if they can prove it, then I'm in their hands, I'm here, they can kill me, I'm ready for it.

Q. I know this must be trying for you but the question I want to ask is; this article said Haqqani had bodyguards. Did you see any armed people with weapons in your village that day?
A. It was the nighttime, I did not see anything or anybody with a weapon but if somebody else did I don't know you can ask them; personally I didn't not see any.

Q. So you didn't see any strangers in his village, that day, the day before or maybe two days before?
A. No. I did not see it but if you have more concerns or allegations you can give it to my PR and he will explain it to me and I will give you all the witness information and people. It was nighttime and I did not see anyone and I don't know if they did they bombed Afghanistan and a lot of places I don't know if they bombed by mistake or not. It was our loss and I am still suffering from it.

Q. This is a question that I asked before. Were you arrested by Americans? Did they speak English?
A. It was Americans.

**Tribunal President's questions**

Q. Who would that witness be?
A. There are many people in the country that I can provide the names and there are people in the camp also.

Q. The person in the camp; could you give us a possible witness name?

UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

A. You can give this allegation to my PR and I will give him the witnesses name and if the president decide to accept it then yes I can bring it. If not, that's fine.

Q. I would like to ask a question about your capture again. If you would again please review for us the circumstances of your capture, how you were approached, who approached you, what happened that evening as you were taken into custody.

A. I was sleeping in the house around three o'clock at night and I heard the sound of airplanes flying. They were flying airplanes in the daytime also but not at nighttime so I woke up. So I got up and I put my shirt on and I saw a soldier coming to the house. I went and approached him thinking they wanted to ask more questions about the bombing that happened before. When I got there they just said to turn around and they handcuffed me. They handcuffed me and my brother and my son they brought them also. We have five or six houses in the village, in one area and the soldiers were around the whole village. They got us and they were putting us on the chopper and I saw another villager and they brought him also. So they brought us together to the base and finally they brought us here and then asked me if I had a radio with me. They asked me who's radio was that and I told them it wasn't mine because if it was mine they should have record that it was captured with me. They didn't have anything it was just asking and nothing else. If it is my neighbor's, I don't know about him because they surrounded all six houses. If they found it somewhere else I'm not responsible for it. I don't know how to use it and it wasn't mine.

Q. Your area of your village; The New York Times article implied that a neighbor was your cousin Haji Abjah Gul. Is that correct? Is he your neighbor living next door?

A. He is not my relative but we are close to each other.

Q. Then you know him then?

A. He is a villager yes.

Q. Close as in across the street? Down the block?

A. I don't really know the meters but I will tell you it is not that far and it is not that close.

Q. I understand. I know it's difficult to have distances. I'm familiar with homes and compounds in the Middle East and I do have a question. Do you have more than one wife? I understand how difficult it is because you had lost your wife during the bombing so I have extreme sympathy and it is very hard for me to ask this question.

A. Only one wife.

Q. The reason I asked that question is, just so you understand, it is not normal for our culture to have more than one wife but I do understand it is tradition. If so, the compound would have different homes within the compound. That may explain some of the confusion we have about some of these reports of damage.

A. It was a big house with seven to eight rooms. Since I was married, two of my brothers were married, and my sons, they are married so each one needs their own rooms. That's why I have this many rooms in one house.

UNCLASSIFIED//FOUO

UNCLASSIFIED//~~FOUO~~

Q. I understand. Thank you. I'll ask one last question regarding the allegations that were provided to us. It goes back to the thirty thousand rupees provided by Pacha Khan through, I believe you said, the village elder to rebuild your home. At the time of your capture did you have any commitments or any occupation or relationship with the governor of Khost to repay the loan or repay any of these funds?

A. The witness was there and he explained it also. What more information do you want from me?

Q. I was just reconfirming that you didn't have any kind of relationship with Pacha Khan and it was just a village affair.

A. Pacha Khan is from the Gardez province and I am from Khost. We don't even live in the same area. Like the witness said I did not know him and I never had any relation with him. The person in the village is Nazim; he had given me the money and if he knows him or has any relations with him, I don't know.

Tribunal President: That concludes this reconvened Tribunal.

Detainee: (inaudible) stuff to the PR about the village elders.

Tribunal President: Yes. That was what I was getting to next.

***The Tribunal President confirmed with the Personal Representative that he had no further evidence and that the Detainee had no previously approved witnesses to present to the Tribunal.***

Personal Representative: During the interview prior to the reconvene of this Tribunal with the detainee, he had mentioned that during one of his interrogations during the first half of his detention here at Guantanamo that he was shown a document that was written by the Counsel of Khost which is comprised of tribal elders. This document stated that his house was bombed by accident and requested, through the United States Army, that he be released.

Detainee: The Counsel wrote to the American government that the person is innocent and that nobody went to his house and America went and bombed his house. It was wrong information and they should pay him for his loss.

Tribunal President: I understand your request that the Personal Representative has provided us. I will consider requesting that document but that would be addressed in a closed session. For the record, your previous request for additional witnesses to address other matters is also taken under advisement. I would like the Tribunal to deliberate and if we require additional information we can review the status of your witness request. As the detainee is well aware, some of the matters discussed here are a matter of relevance, do they relate to your classification as an enemy combatant. We will adjourn this open session with the comment that I would like to make to the detainee that we will consider these matters carefully and make our determination accordingly.

Detainee: Can I say something?

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//FOUO

Tribunal President: You may, we have not formally adjourned.

Detainee: They bombed my house and I was captured in my house. I wasn't a commander, I was never in any fight, I didn't want to fight against anyone. So how could I fit into the description of enemy combatant?

Tribunal President: I understand your comment and we will consider these matters.

Recorder: Can I ask two questions?

Tribunal President: That is a good point of order that the Recorder should have an opportunity to ask questions.

*Recorder's Questions*

Q. When the Americans came and captured you, did you ever go outside?
A. They captured me in the room, inside.

Q. You said you heard the airplane. Did you not go outside to investigate that?
A. Like I said the plane was flying in the daytime but I heard it I went outside to check it because they were flying the whole day.

Q. Did you hear any gunfire prior to you being captured?
A. No.

Detainee: The only thing I have a question or concern is that what happened to and I want to actually suffer. Because you all know what happened to me, it was wrong what happened, and it was [based on] wrong information. Nobody came to our house, nobody can say anyone was in my house and I do not know that person.

Tribunal President: I understand your comments.

*The Tribunal President explained the remainder of the Tribunal process to the Detainee and adjourned the open session.*

## AUTHENTICATION

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.

Colonel, USAF
Tribunal President